10978

EDWARDS v. SEABOARD AIR LINE RAILWAY CO.
(113 S. E. 134)

CARRIERS—EVIDENCE HELD TO SUPPORT VERDICT FOR PUNITIVE DAMAGES.— In an action for damages alleged to have been caused by a false representation to plaintiff that a certain train would arrive, inducing him to spend a night in defendant's unlighted, unheated waiting room, and subjecting him to annoyance by drunken persons therein, evidence *held* to present a question for the jury as to punitive damages.

Before GARY, J., Marion, fall term, 1921.    Affirmed.

Action by F. M. Edwards against Seaboard Air Line Ry. Co. From judgment for plaintiff the defendant appeals.

The complaint alleged, *inter alia*:

III. That at McColl, in the County of Marlboro, and State of South Carolina, on the 22nd day of September, A. D. 1916, the plaintiff went to the railroad station of defendant, intending to become a passenger from McColl, S. C., to Smithboro, S. C., on a train due and scheduled to arrive at McColl at or about 9:15 p. m. That upon the representation. of defendant's agent, then and there employed by the defendant for the sale of tickets to passengers and to advise passengers of the movement of trains, that said train would arrive in about 15 minutes, plaintiff then and there purchased from the defendant a ticket from said station of McColl, S. C., to Smithboro, S. C., likewise a station on the line of defendant, and paid therefor the usual fare, according to the tariffs of defendant, and upon the payment of said sum received from the defendant a ticket good for one continuous passage between McColl, S. C., and Smithboro, S. C., on the date stamped on the back of said ticket, to wit, September 22, 1916.

IV. That plaintiff waited for the arrival of the train scheduled to arrive at McColl, S. C., for Smithboro, S. C., and which defendant, through its duly authorized agent, acting within the scope of his authority, had advised plaintiff would arrive in about 15 minutes after the purchase by him of said ticket. That the defendant negligently, carelessly, wantonly, wilfully, and in utter disregard of the rights, convenience, and comforts of the plaintiff failed to notify plaintiff either by posting or promulgating a schedule or actual notice, that said train, then scheduled to arrive at McColl, S. C., for Smithboro, S. C., would be

late, and that said train would not arrive at McColl during said night.

V. That plaintiff is informed and believes that the train for which defendant's agent sold plaintiff a ticket from McColl to Smithboro had been or was annulled, and plaintiff alleges, on information and belief, that the defendant negligently, carelessly, wilfully, and wantonly failed to post any notice of said annulment, and defendant's agent, the ticket seller at McColl, negligently, carelessly, wilfully, and wantonly failed to notify plaintiff, at and before the purchase of said ticket, that said train had been annulled, and would not arrive, but, on the contrary, defendant's agent at McColl informed plaintiff that said train, scheduled to arrive at McColl for Smithboro at or about 9:15 p. m., would arrive at McColl for Smithboro in about 15 minutes.

VI. That at the time of the purchase of said ticket from the defendant by the plaintiff, defendant was advised that it was urgent that plaintiff reach his home at Smithboro during said night; that plaintiff's wife was alone and sick, and that by reason of the failure of the defendant to notify plaintiff that said train then scheduled to arrive would not arrive during the night, the plaintiff was worried in mind and greatly distressed at being unable to reach home, and by reason of said failure to so notify plaintiff, plaintiff was expecting said train to arrive, and did not telegraph or otherwise communicate with his wife.

VII. That by reason of the false representation by defendant that the train from McColl to Smithboro, S. C., would arrive in a few minutes, and by reason of the failure of said train to arrive, plaintiff was forced to spend the entire night in the waiting room of the defendant, and that the defendant negligently, carelessly, wilfully, wantonly, and in utter disregard of the rights of plaintiff, knowing that plaintiff as a passenger was expecting said train, and was waiting therefor, failed to light said room, and that although after midnight it was cold, no fire was provided

in said waiting room, and the defendant further negligently, carelessly, wilfully, wantonly, and in utter disregard of the rights of the plaintiff allowed drunken persons to come into said waiting room and to annoy and harass the plaintiff and others in like situation, and offered no degree of care for the comfort and protection of plaintiff and others like situated.

VIII. That by reason of the aforesaid acts of negligence, wilfulness, and wantonness of the defendant, the plaintiff was forced to spend the entire night in the waiting room of defendant at McColl, S. C., without lights, without heat, without the protection from annoyance and harassment to which he was entitled, and suffered mental and physical fatigue and anguish and loss of sleep, and was thereby damaged by the defendant in the sum of $10,000.

The answer alleged, *inter alia*:

(3) That on the night in question its train left Hamlet, N. C., on schedule time, which fact was communicated to its agents at various stations, and was proceeding on its regular schedule, when, at an inaccessible point, remote from communication by telephone or telegraph, its said train ran into a wreck of a freight train and could proceed no further; that, after all due and reasonable efforts to have the track cleared, so that the train might proceed, without success, a number of the crew were forced to walk back to Hamlet to communicate the situation to the dispatcher; that defendant maintained an office force for the conduct of all reasonable business with reasonable office hours, as was required by law, at its station at McColl; that the office hours of its agents at McColl had expired before the situation could be communicated to them, so that they might advise passengers of the wreck, as hereinbefore set forth, and it specifically denies that its conduct in failing to notify plaintiff was negligent or wilful, but, on the contrary, alleges that such failure arose from unforeseen contingencies over which it had no control.

The testimony was as follows:

F. M. Edwards, sworn, testified:

On the 22nd day of September, 1916, I lived at Fork, S. C. I left home and went to McColl, S. C., on the afternoon of September 22, 1916, on official business. I was rural police of Dillon County then. I intended to return home on the night train that was supposed to have come from McColl about 9:15, on the Seaboard Air Line. The Seaboard Air Line maintains a track and operates passenger trains from McColl to Smithboro, and I was going to get off at Smithboro. I went to the station intending to take that train. Mr. L. H. Smith and H. M. Moody were with me. I went on the inside of the main office where the agent stays. I bought a ticket. The operator was in the office and he was acting as ticket agent, and we were on the inside of the main office, and the conversation came up about spending the night and so forth. Of course we said we couldn't spend the night, that my wife was by herself, and I was obliged to return home. I told them she was not well and was alone. I was compelled to return that night. I inquired of the agent about the train, and as well as I remember I think he told me the train was due about 9:15. I purchased a ticket and walked down —Yes; I have that ticket. (Ticket introduced.) I think the agent told me the train was due about 9:15 and it was 15 minutes late.

We were with Mr. Dority there, who was electrician there at the time and acted as policeman. In the presence of the ticket agent he asked us to go to the electric light plant. He was with us pretty well all the time, and we walked down to the light plant and returned in not more than 10 minutes. I imagine the light plant was on adjoining property to that of the railroad property, just below the station on the railroad. I reckon I returned to the station in about 15 or 20 minutes in advance of the train time, according to

what he said. When I got back the lights were out, the station dark, and the main office I presume was·like the waiting room; was open, but dark; no fire and no lights. We went in and struck a match to see the situation of the seats, and sat down, some on the inside and some on the outside, backwards and forwards, expecting the train to come every minute. We stayed there until about midnight, and we went inside, and I was about half asleep until somebody came in there drunk or drinking and striking matches and looking in our faces. I got up and stayed there all night until 10:10 the next day. Nobody was there to tell us about the train. About 10 o'clock we went to the bulletin board to see if anything had been posted about the train at all, to give us any information with reference to the train. I didn't see anything on the board at all about that or any other train. I stayed at the station all night. Along after midnight it was pretty cool; it was very uncomfortable without any fire. Nobody there but two or three people half drunk around there, having pretty rowdy behavior. There was absolutely nobody there from the time I came back to the station until the next morning. There was no agent. there, unless he was in that drunken crowd. I didn't see anybody go in that station at all. I didn't know the agent very well. I know the man that sold us the tickets. Nobody offered to give me any information. I just remained there expecting the train to come. Mr. Moody and myself went below the depot and got breakfast, and still no train. Another man—I don't know whether he was the agent or not, but one man came the next morning and we went inside the waiting room, and Mr. Moody asked him about the south-bound train, and he looked at Mr. Moody and asked him, "What south-bound train?" Mr. Moody told him and they had some conversation. He told Mr. Moody that that train had been annulled. I spoke up and says, "Where did you ever hear of a railroad annulling a train without giving anybody notice?" He was not the man that

sold me the ticket. I asked him did he ever hear of a railroad that annulled a train without giving the public information. I said, "We purchased tickets to go on that train last night, and we should have had notice of it," and that we spent the entire night looking for that train.

Of course I was worried about my wife. I left her with the expectation of getting back, she was at home with a little kid, with nobody with her and she was expecting me back, and I was at McColl and had no chance to get to her by wire and didn't know what to wire. I would imagine it is about 35 miles from McColl to Smithboro by county road. If I had been notified about the train, I would have gotten an automobile and gone home. We bought another ticket. I went up to get a ticket, and this man said he would redeem the ticket I bought last night. I told him I didn't care to redeem it; that that was my property. He said, "It don't cost you anything; I will give you a ticket." I told him I didn't want him to give me a ticket. I would purchase a ticket. We came to Smithboro, and got there about 12 o'clock. On the train I saw a special agent, or special detective, Mr. McDonald, I think his name is.

Q. What did he tell you about it? (Objected to.)

The Court: I don't think it has been shown sufficiently that he was an agent of the railroad.

We got to Smithboro about 12 o'clock. I had had no rest. I had worked hard all day the day before and up to that day midday, and had not slept any.

Cross-examination:

I never saw the train I expected to ride on. I bought a passenger ticket. Sometimes it was a freight train, pulling passenger coaches; sometimes it didn't have anything but passenger coaches. I don't know whether it was a regularly scheduled freight train of the Seaboard carrying passenger coaches and was irregular in its schedule. I didn't ride it that often. I saw it very frequently. It carried box cars. It was about 2 or 2½ miles from Fork to my home. The

train was supposed to get to Smithboro somewhere in the neighborhood of 11 o'clock at night. I lived 2½ miles from there. I was a rural policeman. My duties did not call me to McColl at night. My duties did call me away at night, but my wife usually knew where I was going. She knew that I had gone to McColl, and was expecting me home on that night train. Yes; my duties would call me away from home at night, but she would know where I was at.

I did not see the gentleman who told me the train had been annulled at the depot that night. The first time I saw him was next morning. I presume it was Mr. Adams; I think his name was Adams. He was courteous to me. We were not around him but a little; he offered to exchange tickets. He must not have stayed at the depot long, for after we got back after going away a few minutes he was gone and everything dark.

It was in September. It was not real cold, I mean it was not pleasant from 12 o'clock on to daylight without any fire. It was very unpleasant before day. I must have suffered from the cold. I didn't have any place to lie down and any cover or any fire, nothing but a plain bare waiting room. The policeman stayed with us a little while and went away. I was a policeman at that time, and had no reason to be frightened by the drunk men. I was armed, but I concluded I had rather stay awake and stay alive, because they were in the waiting room, and I left them in there. I presume I went back in there in about an hour. They were gone then. I sat up the entire night. I stayed awake. About 8 o'clock, I think, next morning, I found out the train had been annulled. The other train was due about 10. I didn't care to pay for an automobile to go home then, when it was only an hour or two until train time.

The agent did not treat me discourteously; he had no opportunity to do so. So far as having anything to say he was polite. He didn't know anything about our spending the night, because he was not down there the night before.

L. H. Smith, sworn, testifies:

Direct examination:

On the 22nd day of September, 1916, I lived at Smithboro. I went to McColl with Mr. Furman Edwards and Mr. Moody on that day. Mr. Moody, the Superintendent of Education of Dillon County, Mr. H. M. Moody. I intended to return on the night train on the Seaboard Air Line. We left around 9 o'clock for the train. When we got to the station we went in the office. One Mr. Adams was in there. He was acting agent. He was looking after his duties. I suppose, of the office. Mr. Edwards made the remark in Mr. Adams' presence that his wife was sick, and he would have to get back I have forgotten what Mr. Adams said about the time the train would arrive; but 9:15, I think it was, about 15 minutes late. Mr. Edwards inquired about the time of the train.

A man there that ran the power plant asked Mr. Edwards about walking down to the plant; that he had some adjustments to make. It was a very short distance, I reckon the length of three or four cars. We were not gone over 10 minutes. I went with him. When we came back there was no one there; the waiting room was dark; there was no light. Mr. Edwards walked around there to the bulletin board and struck a match and looked at it. There was nothing at all on it. We were around there all night. There was no light, only occasionally somebody would strike a match and peep in. We tried to rest, as it looked like it was a little unsafe. The people seemed to be a little boisterous. They appeared to be drinking. It was a little cool in the latter part of the night. We had no fire. It would have been more comfortable with a fire. Mr. Edwards stayed there until the passenger train next day, about 10 o'clock. I went back with him. We got to Smithboro some time near 12 o'clock. We saw the agent next morning, but it was not the same man selling tickets the night before. He said the train had been annulled. Mr. Ed-

wards asked him. Mr. Edwards said he never heard of a train being annulled without notice beforehand.

Cross-examination:

We went to the electric plant with the operator; I don't remember his name. He was in the office when he invited us to go to the plant. Mr. Adams was there. That train was a passenger, mixed train. It carried both freight and passengers. It was a freight train with passenger coaches on it. I live within 50 or 100 yards of the crossing at Smithboro. That train was not very regular on schedule. The schedule was not regular, but at that hour I was almost always asleep. I don't know of its being four or five hours late. I don't know whether the opposite of that train came by Smithboro in the morning from Poston. That freight train was not regular at all, but I was usually asleep at that time. We were looking to get back when the train was due. I don't know anything about the irregularity of it. When we left home we relied on coming back on this train. It was an irregular train.

H. M. Moody, sworn, testifies:

Direct examination:

On September 22, 1916, I lived at Kemper. I live at May, S. C., now. That is in Dillon County. I was at that time a farmer; now I am Superintendent of Education. I went to McColl, S. C., on September 22, 1916, from Smithboro with Mr. F. M. Edwards and L. H. Smith. McColl is in Marlboro County. Smithboro is right on the line of Marion and Dillon Counties, I think. The three of us with Mr. Dority went to the station at McColl about 9 o'clock. We went into the ticket office where the agent was. Mr. Adams was in the ticket office. He was acting as agent, representing the railroad. Mr. Edwards inquired what time the train was due, and as well as I remember Mr. Adams said about 9:15, and stated it was about 15 minutes late, and he said it was necessary for him to get home, for his wife was sick. Mr. Edwards bought a ticket.

Mr. Dority—he was the engineer—insisted that Mr. Edwards go with him to look over the light plant, which was near by; and so all three of us went with Mr. Dority to the light plant. We were not gone exceeding 10 minutes. About 20 minutes before he told us it would arrive. When we got back we found the waiting room dark, but open. We went into the waiting room and walked around. Some time in the night Mr. Dority left us, and we waited around for the train. There was no one else to give us any further information about the train. We looked at the bulletin board to see if we could find anything on it.

We spent the night there. There was no light nor fire there all night. It was unpleasantly cool. There were some people that came around there and would strike matches occasionally; seemed to be in a drunken condition. They were boisterous. Next morning Mr. Edwards and I went to a house nearby and got breakfast and came back about 8 o'clock, and the agent came in, not the one we bought the tickets from, and I asked him where was the south-bound train due to come south the night before. He looked at me like he didn't know what I meant, and I repeated the question and said, "We bought tickets here last night, expecting to go on that train and it has not come, and we would like to know when it will come." He went over to his machine, and came back and said it had been annulled. Mr. Edwards said who had ever heard of a train being annulled without giving due notice. I think that train came in at 10 minutes past 10. We got back to Smithboro somewhere near 12.

Cross-examination:

It was not exactly cold, but unpleasant before day. The policeman had left before these rowdy people came around. They would strike matches in Mr. Edwards' face, not any more to Mr. Edwards than to the others; they would strike matches and look in the faces.

Re-direct examination:

They would strike matches and stick them right up under his hat most.

F. M. Edwards, recalled:

Direct examination:

That train was a little irregular sometimes. I don't know about all the time. I had ridden the train from Clio, Menton, and Dillon. All trains had been late on that road. I have ridden it when it had box cars on it, and sometimes the passenger train had box cars. I reckon that train was little more irregular than the morning train. I have ridden this when it was 30 minutes, an hour, and two hours late. I have ridden it a good many times. I think the agent said it was due about 9:15, and he said it was 15 minutes late.

Cross-examination:

I have ridden on the Coast Line trains; they run late too. I think at times this train was more irregular than the passenger trains. Sometimes it would have box cars they would shove into a siding, and sometimes it would not stop all the way down. I have never ridden it when it stopped for an hour or two. All of the trains carry box cars. I did not know it was an irregular train. It always made fairly good time when I went on it.

For the defense, F. S. Adams, sworn, testifies:

Direct examination.

"I was born and raised in Marlboro County, near McColl. I work for Marlboro Cotton Mills. I have been working there about five years. I worked for the Seaboard something like a year, at the station at McColl. I was a clerk there. I am not a telegraph operator, and have never been. I do not distinctly remember this night, but I do remember he was there. Mr. Edwards came in, and as well as I can remember asked what time the train was due, and I told him in about 15 minutes. It was then about 9 o'clock. I had no report on the train, but it was due about 9:15, according to the schedule. He purchased a ticket to Smith-

boro, and as well as I can remember, that was all there was to it. My recollection is that he asked what time the train was due. That is what I meant; that the schedule to arrive was 9:15. I went on duty at 8 o'clock in the morning, and worked until 6 o'clock in the afternoon, and went back to meet this train, and was supposed to stay there until 10:30 or 11. Sometimes I stayed later if the train was late, and I locked up and went home. I had no way to find out if the train was late except by telephone. I tried to get different agents up the road, and was unable to get anybody to answer the 'phone at all. I think the only place I was ever able to get at any time on the telephone was Gibson. I do not know whether the trains ever arrived at Gibson that night. I stayed until 11:30 or 12 o'clock, but could find out nothing, so I went home. I lived in McColl something-like three years. The City of McColl owned and operated the electric plant. As well as I remember, at one time—I don't remember whether it was at that time—at 12 o'clock—and then they changed the hour until 11—the lights were cut off. Next morning when I went to the depot I found out the train did not run. It was not cold enough for me to have an overcoat, as well as I remember.

Cross-examination:

I worked for the railroad company about a year. I got a better job at the mill. I can't say positively, but I think September 22, 1916, was the date of this affair. I quit the employment of the railroad company about the first of 1917, not long after this occurrence. This had nothing to do with my quitting. I know the difference between a freight train and a passenger train. I sold tickets for the freight trains when they were supposed to carry passenger coaches. This was a mixed train. I couldn't say whether it was scheduled as a passenger train or not. It was a train to carry passengers. I sold Mr. Edwards a ticket, about 9 o'clock, as well as I remember. I told him the schedule was 9:15; and I do not remember saying it was 15 minutes late, at all. I

deny that. I could not say positively I did not say that. There was a telegraph operator in that station from 8 to 6.

There was no way to find out when the trains were late or when there were wrecks, unless I could get some other agent over the telephone. I did not communicate to the other stations on that line by telephone altogether. Yes; at night that was the only way I had to communicate with the other agents. We could talk to Hamlet if we could ever get them over the telephone. I did not find out whether the train was not due to arrive that night. I left the station without knowing whether that train was coming or not, knowing I had sold these gentlemen tickets over that line. I made an effort to find out by trying to get the agent at Gibson and Hamlet over the telephone, and couldn't get anybody to answer it. I don't know why. It might have been the agent was out or some trouble with the 'phone. I have tried to get them a good many times and couldn't get them. I don't know whether it was unusual or not; but I have tried to a good many times and have never been able to get them. I don't know anything about Mr. Edwards having gone to the light plant. I did not close my office at 9 o'clock. The lights went out just as I left the office. I stayed at the office during that time. My light was not out until the town turned them out. I was not hiding from them.

As well as I can remember, I told them I had made an effort to get these other stations to find out where the train was. I left the station at 11 o'clock. I don't know whether I told Mr. Edwards I was going or not, but told him I couldn't find out anything about the train. I told him when I went to leave. As well as I remember, I came out of the station and told them I couldn't find out anything about the train, and I was going home. I had never seen these men before that occurrence. I could not swear that they were the same men. I did not find out over the telephone that this train was not coming, and I did not immedi-

ately shut up and leave the depot. It is my duty to stay there, according to the orders of the agent, until about 11 o'clock, whether the train arrived or not. Those were my orders. I said they turned the lights out usually about 12 o'clock. I could not say positively what time the lights went out that night. I can say they went out. I left there about the time the lights went out. I know it was the custom of the town to turn them off at that time. I couldn't swear the lights were out. I left somewhere around 12 o'clock. I don't know whether it was 11:30. It was nearer 12 than any other hour in the night. I couldn't say who was there. I don't know that I saw him there. I wouldn't say I saw him there. I said I supposed it was Mr. Edwards. There was a group of men. I sold him a ticket. I didn't know his name, but I think I would know his face. I knew the train hadn't come when I left. I couldn't swear I told Mr. Edwards. I told a group of men standing out there. I don't know how many. I told them I couldn't find out anything about the trains, and I was going home. I left them without lights or fire or anything, except a ticket to travel on that night.

Re-direct examination:

I left the railroad service voluntarily. As a usual thing this train carried both box cars and passenger cars. This train was irregular. I have waited on it when it would be as much as an hour late. This was not the only night I left before it got there. I do not know what agencies sell tickets for that train.

Recross-examination:

I would not swear that I didn't tell them that train was 15 minutes late. It was a very irregular train. It was at the time I worked there more irregular than any of the rest of the trains. I don't know anything about it now. I don't know that it was before or since delayed all night. I have waited on it when it would be as much as an hour late, and left there and it hadn't come at all. I left there with pas-

sengers holding tickets. I never posted any train on the bulletin board. I don't know anything about the rules. The train might have had a schedule. I didn't post in the waiting room the schedule of that train. I mean the regular schedule was not posted, as I know of. I didn't do it. The population of McColl is about 2,000.

Re-direct examination:

I think they did have a blackboard out there for the announcement of the arrival and departure of the train, but I don't know whether they ever posted it or not. It was not my duty.

Recross-examination:

I said we had a blackboard. I didn't keep it black. I couldn't say that anybody ever wrote on it.

C. F. Heffner, sworn, testifies:

Direct examination:

I am conductor on the Seaboard Air Line Railway. I run from Hamlet to Poston. I have been with the Seaboard 10 years. I was conductor on train No. 23 on the night of September 22, 1916. That is the train the discussion is about. That train did not operate that night on account of a derailment about 4½ miles south of Hamlet. The first telegraph or telephone station after leaving Hamlet is at Gibson, 10 miles away. Four and a half miles out of Hamlet there was a derailment. There were 3 cars, as well as I remember, that were derailed, and 1 of the cars was torn up, which damaged the track considerably and it was necessary to get a wrecking outfit from Hamlet to clear this derailment away, which took several hours. When my train left Hamlet it proceeded to the point of the wreck. I couldn't get around it. It was not possible to go by until after the derailment had been cleared away. I saw the derailment. The engine ran into 3 cars that were standing still, and the first car next to the engine that was hit was completely demolished and the 2 cars were thrown off the track. That was not my train; it was a freight train.

I saw the wreck; it was the derailment of freight cars. I could not get my train around it. I backed my train up to Hamlet. I got to Hamlet about 11 or 11:30 that night.

It was not possible for the two crews to clear that track without the assistance of the wrecking outfit. I was between the wrecking outfit and the wreck. The closest outfit was in Hamlet. I do not know the exact time the track was cleared, but it was cleared in the early morning about 4 or 5 o'clock. In the meantime we were in Hamlet, awaiting instructions in regard to the clearance of the track. Do not know just what time my train was annulled. As well as I remember, we were relieved at 5 o'clock next morning. I don't know what time the wrecking train got the track clear. There was nothing for me to do except to go back to Hamlet. The railroad running from Hamlet down to Smithboro and McColl and Mullins and Poston is the East South Carolina Division. The dispatcher lives at Charleston, S. C. The reason I didn't operate the train was because of a wreck, of which I knew nothing when I left Hamlet. It was a mixed train, freight and passenger. It had both kinds of cars that night. I do not recall how many freight cars, we had about the usual train, from 7 to 10 freight cars and two passenger cars. I ran this train about 2 years. The train in both directions was very irregular, due to the handling of freight cars. I did my freight work as I went down the road. Making up the train in Hamlet was usually the cause of delays. The cars we handle, the freight cars, mostly contain merchandise worked up at Hamlet, transferred during the day and switched out at night, and owing to the yard condition at Hamlet, was the cause of the train getting out late at time. It often lost time working down the line. The main places to meet this train were Gibson and McColl. They were the only places that sold tickets to this train, and very often they didn't meet it, on account of the train being late.

Cross-examination:

My company did have agencies at Gibson and McColl to meet this train. I was conductor on this irregular train. This train was not any more irregular than any other freight train. That is the only mixed train we operated on that division, that I came in contact with. I don't recall having been late all night before. I have been 30 minutes late without a wreck. It was a very rare thing to get out without being 30 minutes late. I left Hamlet about 9:30 or 9:40. The schedule, as well as I remember, was 8:50 leaving Hamlet. I had left Hamlet 4 or 4½ miles to where there was a derailment; there was no head-on collision. My train was not mixed up in this wreck. I backed up to Hamlet, and made a report of the accident. I reported to the superintendent's office by wire. I did not attempt to phone the agencies that were to meet this train, for that is out of my line of work entirely. It was no one's duty to do this at Hamlet, that I know of. I got there around 11 or 11:30 at night. Hamlet is division headquarters for the North Carolina Division. There was nobody there to report to McColl that I know of. I reported it to the superintendent's office in Charleston. The telegraph operator at Hamlet did that. If there had been anybody in the McColl office, he could have reported it by phone, but I do not know that that was his duty.

Redirect examination:

The headquarters of the East Carolina Division is at Charleston, S. C.

W. H. Wroten, sworn, testifies:

Direct examination:

I am employed by the American Telegraph & Telephone Company. I was formerly employed by the Seaboard Air Line. I left their employ the latter part of 1920. I had another job offered me, and I left the railroad company to get the job. I was agent of the Seaboard at McColl, S. C., on September 22, 1916. I judge the town had between

2,000 and 2,500 inhabitants. The agent and one clerk were the railroad employes at McColl. These were adequate to handle the ordinary business. Mr. Adams at that time was clerk. He was not an operator, but I was. My hours were from 8 in the morning until 6 in the afternoon, with an hour off for dinner. I did not have to meet this train at night and sell tickets for it. I was off from 6 o'clock in the afternoon until 8 in the morning. I knew nothing of this occurrence until next morning. The following morning some gentlemen—I don't recollect who they were—asked me what about that train that was supposed to have come the night before; and I asked, "What train?" They explained to me that the train hadn't come, and I called up the dispatcher in Charleston for some information, and was informed that there had been a derailment up the road and the train didn't run, and the train had been annulled. I telegraphed to the dispatcher; there was no other way to reach him. We had a telephone line through there that you could talk to Gibson on and Clio, but that was all. Since that time telegraph lines have been put in there. The telephone lines were up, but we found them unreliable and put in the telegraph. Inside of 5 minutes I got the information that the train had been annulled on account of the derailment. It was a mixed train. I did not meet it at night.

Cross-examination:

I never was able to get any reliable service through the telephone to Hamlet. I never phoned to Hamlet. The phone line ran to Hamlet, but, as I said, I never had been able to get any reliable service further than Gibson. I don't remember that I ever talked to Hamlet. I wouldn't consider it reliable to Hamlet. We kept the office open at night without a telegraph operator. The agent had to depend for his information by finding out from Gibson, N. C., when it got through, at night. I don't recollect for certain whether there was a telegraph operator at Gibson. I would not state positively; I have never stopped off there. The Gibson agency

would have to get information from Hamlet by telephone, I suppose. I did not tell you that Gibson could not get it from Hamlet; I told you we could not reach Hamlet from McColl. If the telephone lines were good you could. Mr. Adams was meeting that train at that time. That train was very irregular and my instructions to Mr. Adams were to wait a reasonable amount of time, and as Mr. Adams had to go to work the next morning I couldn't expect him to wait all night. My instructions were to wait a reasonable amount of time. I had no one to relieve him. It is my duty to do the best we can. A man couldn't stay there all night and work all day too. When it was cold we made a practice of making a fire. If it were real cold he left a fire burning, and a body could keep it up when he went away. I think it was the most irregular train I ever had anything to do with. I think I have seen a blackboard out in front of my office. The trains were marked up when there was a telegraph operator there. Of course that was my job. It was not Mr. Adams' job. He didn't take my place as telegraph operator. I think you misunderstood me a minute or two ago. I told you we posted the train when there was a telegraph operator there which was between 8 in the morning and 6 in the afternoon. That man on duty at night was selling tickets and taking care of bagage. He did not bulletin the trains. The telephone was not as good as the wire; it was not as reliable as the telegraph wire.

Re-direct examination:

I kept the trains posted. I never had been in the Gibson office. I never have stopped at Gibson except going through on the train.

Recross-examination:

That man at Gibson very frequently got Hamlet over the long distance telephone. It was separate from the railroad phone altogether.

W. G. Guess, sworn, testifies:

Direct examination:

At present I am chief train dispatcher of the division between Raleigh and Richmond of the Seaboard Air Line. I was working at Charleston on the 22nd of September, 1916. I was train dispatcher. There was no way for my office to communicate the movements of this train with the McColl office in the absence of an operator. The track was cleared from this wreck about 5 o'clock in the morning.

Cross-examination:

I was train dispatcher at the time this occurred. I was in the Charleston office that night. I heard from this wreck at 12 o'clock midnight. I recall from having consulted the train sheets. The Seaboard maintains agencies at Gibson and McColl for this train. They are not retained for the purpose of meeting this train. They don't maintain agencies at any point for the purpose of meeting any particular train. They are for the purpose of transacting the company's business. It is the company's business to meet the trains, the agencies at Gibson and McColl were not maintained for the purpose of meeting this particular train. At the time there was a man, a clerk, I suppose, to meet train No. 23, which is the train in question, when it is not unusually late. It is his duty to let him know if there is any way that the train is annulled. There was no way to notify him. My train dispatching was done by telegraph. If my memory serves me correctly there was a telephone line between Poston, S. C., and Gibson, N. C., that worked from one station to another, not through. I don't remember the stations. There were agents at Poston and Andrews at night. There was a telegraph operator at Poston at night. I cannot tell you whether an effort was made to communicate with the agent at McColl prior to midnight. After midnight there was no way to communicate with the agent at McColl. I don't know whether there was a way to communicate with McColl or not. I went on duty at midnight. I do not remember whether there was an all night agent at Dillon, but I think not. I wouldn't say that there was not an all night agent at

Dillon, because I don't know. If I had been able to wire Dillon, Dillon could have phoned McColl. I don't know whether there was a telegraph operator at Dillon or not. I came on duty at 12 midnight, and there was no one on duty. After I came on duty no effort was made to communicate with McColl. I do not know what was done before I came on duty. All I know about it is what my record sheets show.

In reply, F. M. Edwards, recalled:

Direct examination:

During the year 1916 I traveled in and out of Dillon at night. I was always able to get a ticket there. I have purchased a ticket for that train going up in the morning pretty early, and been there when I didn't want a ticket and found an agent there. Mr. Adams did not tell me that he didn't know anything about this train. He didn't tell myself, Mr. Smith, or Mr. Moody, and we were there all night. Not later than 9:15 or 9:20 there was not lights in the office. When we got back from the electric light plant, the lights in that office were out, and that was not later than 9:20.

L. R. Smith, recalled:

Direct examination:

I didn't hear Mr. Adams say anything about the train. The lights were not on at 11 o'clock. I don't know about 9:20. They were off in the office and the waiting room when we came back.

H. M. Moody, recalled:

Direct examination:

Mr. Adams did not tell us that he had been unable to get any information about the train. The lights were not on until 12 o'clock. They were not on when we came back from the electric light plant. We came back about 9:20. It was then dark in the office and the waiting room, and the lights were not afterwards turned on.

*Mr. M. C. Woods*, for appellant, cites: *Passenger on a mixed freight and passenger train takes passage subject to delays*: 64 S. C. 423. *Schedules not guaranteed*: 84 S. C.

175. *Carrier required to maintain reasonable office hours:* 71 S. C. 303; 71 S. C. 386; 77 S. C. 378. *No ground for punitive damages:* 87 S. C. 245.

*Messrs. Mullins & Hughes* and *Henry Buck,* for respondent, cite: *Duty of carrier as to waiting rooms:* 1 Civ. Code 1912, Sec. 3266. *Violation of Statute sufficient to take case to the jury:* 106 S. C. 123. *Who is passenger:* 81 S. C. 277. *Care to which passenger is entitled:* 88 S. C. 477. *Defendant sold tickets and knew plaintiff was to take train:* 88 S. C. 421. *Punitive damages properly submitted to jury:* 69 S. C., 117; 65 S. C., 99; 91 S. C., 71.

July 25, 1922.

The opinion of the Court was delivered by MR. CHIEF JUSTICE GARY.

This is an action for damages, in which the jury rendered a verdict for the plaintiff, in the sum of $100 actual damages and $600 punitive damages.

At the conclusion of the testimony, the defendant's attorneys made a motion that the issue as to punitive damages be withdrawn from the jury, on the ground that there was no testimony from which the jury might infer that there had been a willful and wanton invasion of the plaintiff's right by this defendant. The motion was refused, and the sole exception in the case is as follows:

"Because his Honor erred, it is respectfully submitted, in refusing defendant's motion for a verdict as to punitive damages; it being respectfully submitted that there was no evidence from which the jury could reasonably infer that there had been a willful and wanton invasion of plaintiff's rights, or such conscious failure to observe due care as would amount to wilfulness."

As the facts are somewhat complicated, it will be necessary to report the complaint and answer (omitting the formal allegations).

A careful consideration of the testimony satisfies this Court that the ground upon which the defendant appealed is not sustained by the testimony.

Affirmed.